| | | |
|---|---|---|
| THE JAMES B. OSWALD COMPANY d/b/a OSWALD COMPANIES, a wholly owned subsidiary of JBO Holding Company 1100 Superior Avenue, Suite 1500 Cleveland, Ohio 44114 | ) ) ) ) ) ) | Case No. Judge |
| and | ) ) ) | **VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, AND OTHER RELIEF** |
| JBO HOLDING COMPANY 1100 Superior Avenue, Suite 1500 Cleveland, Ohio 44114 | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| DENNIS NEATE 3776 Retreat Drive Medina, OH 44256 | ) ) ) ) | |
| and | ) ) ) | |
| MICHAEL MAITLAND 513 William Street LaGrange, OH 44050 | ) ) ) ) | |
| and | ) ) ) | |
| ANNETTE BLANC 6572 Cross Creek Trail Brecksville, OH 44141 | ) ) ) ) | |
| and | ) ) ) | |
| CHRISTINE PODLOGAR LOISELLE 320 Lakeland Way Aurora, OH 44202 | ) ) ) ) | |
| and | ) ) ) | |
| HYLANT GROUP, INC. c/o Statutory Agent Angela K. Poole | ) ) ) ) | |

811 Madison Avenue )
Toledo, OH 43604 )
)
Defendants. )

NOW COME Plaintiffs, The James B. Oswald Company, d/b/a Oswald Companies, and its parent company, JBO Holding Company ("Oswald") by and through counsel, and for its Verified Complaint against Defendants, Dennis Neate ("Neate"), Michael Maitland ("Maitland"), Annette Blanc ("Blanc"), and Christine Podlogar Loiselle ("Loiselle") and Hylant Group, Inc. ("Hylant") (collectively "Defendants"), hereby states as follows:

## THE PARTIES

1.      Plaintiffs, The James B. Oswald Company, d/b/a Oswald Companies, an Ohio corporation, and its parent company JBO Holding Company, a Delaware corporation (collectively "Oswald"), at all times pertinent hereto, have their principal offices located in Cleveland, Cuyahoga County, Ohio.

2.      Defendant Dennis Neate ("Neate") is an individual in the State of Ohio who, upon information and belief, resides at 3776 Retreat Drive, Medina, Ohio 44256. Defendant Neate provides services to Defendant Hylant at Hylant's Independence, Ohio office that are in direct competition with Oswald (**Exhibit 1** – Neate LinkedIn Profile and Activity; **Exhibit 2** – Hylant 6/8/2022 Press Release).

3.      Defendant Michael Maitland ("Maitland") is an individual in the State of Ohio who, upon information and belief, resides at 513 William Street, LaGrange, Ohio 44050. Defendant Maitland provides services to Defendant Hylant that are in direct competition with Oswald (**Exhibit 3** – Maitland LinkedIn Profile and Activity; **Exhibit 2** – Hylant Press Release).

4.      Defendant Annette Blanc ("Blanc") is an individual in the State of Ohio who, upon information and belief, resides at 6572 Cross Creek Trail, Brecksville, OH 44141. Defendant Blanc

provides services to Defendant Hylant that are in direct competition with Oswald, including, but not limited to, solicitation of Oswald employees.

5. Defendant Christine Podlogar Loiselle ("Loiselle") is an individual in the State of Ohio who, upon information and belief, resides at 320 Lakeland Way, Aurora, OH 44202. Defendant Loiselle provides services to Defendant Hylant that are in direct competition with Oswald, including, but not limited to, solicitation of Oswald employees.

6. Defendant Hylant is a for-profit corporation formed and existing under the laws of the state of Ohio with its headquarters located at 811 Madison Avenue, Toledo, Ohio, 43604 and additional offices throughout Ohio, including an office at 6000 Freedom Square Drive, Suite 400, Independence, Ohio 44131.

## JURISDICTION AND VENUE

7. Oswald brings this action pursuant to the Defend Trade Secrets Act ("DTSA") at 18 U.S.C. § 1836 *et seq*. This Court possesses subject matter jurisdiction over Oswald's trade secrets claim as it arises under the laws of the United States within the meaning of 28 U.S.C. § 1331.

8. This Court possesses supplemental jurisdiction over Oswald's remaining claims pursuant to 28 U.S.C. § 1367.

9. The claims for damages against the Defendants exceed $75,000.

10. This Court possesses personal jurisdiction over Defendant Neate as he resides in the District and Division, performed services for Oswald in this District and Division, and currently performs services for Defendant Hylant in the District and Division.

11. This Court possesses personal jurisdiction over Defendant Maitland as he resides in the District and Division, performed services for Oswald in this District and Division, and currently performs services for Defendant Hylant in the District and Division.

12.     This Court possesses personal jurisdiction over Defendant Blanc as she resides in the District and Division, performed services for Oswald in this District and Division, and currently performs services for Defendant Hylant in the District and Division.

13.     This Court possesses personal jurisdiction over Defendant Loiselle as she resides in the District and Division, performed services for Oswald in this District and Division, and currently performs services for Defendant Hylant in the District and Division.

14.     This Court possesses personal jurisdiction over Defendant Hylant as it is formed under Ohio law and has maintained continuous and systematic contacts with this District and Division, including regular operations at its Independence, Ohio office.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) (c) and (d) as Defendants Neate, Maitland, Blanc and Loiselle all reside in, performed services for Oswald, and continue to provide competitive services for Defendant Hylant in this District and Division. Further, Oswald's principal office is located in this District and Division and Hylant maintains an office location in this District and Division.

16.     Venue is further proper pursuant to 28 U.S.C. § 1391(b) as Oswald and all Defendants have continuous and systematic contacts with this District and Division and a substantial part of the events or omissions giving rise to the claims occurred in, and a substantial part of the property that is the subject of the action is located within this District and Division.

## FACTUAL ALLEGATIONS

17.     The James B. Oswald Company, d/b/a Oswald Companies ("Oswald"), a wholly owned subsidiary of JBO Holding Company, is an insurance brokerage and risk management firm which sells property and casualty insurance, employee benefit plans, life insurance, retirement and financial services and a variety of other insurance and risk-related and financial-advisory and financial wellness products and services.

18.     Defendant Hylant is a direct competitor of Plaintiff in the business of insurance brokering and risk management.

### Defendant Dennis Neate

19.     Prior to his employment with Oswald, Neate was an officer and owner at the Hoffman Insurance Agency, Inc. ("Hoffman"), an Ohio-based insurance brokerage firm which also sold property and casualty insurance, group benefits, life and retirement plans to clients throughout Ohio and elsewhere.

20.     Effective June 1, 2016, Oswald acquired Hoffman, including all of Hoffman's stock shares that Neate and the other owners of Hoffman owned. Through this acquisition, Oswald acquired all of Hoffman's assets, liabilities and took over all of Hoffman's operations, including but not limited Hoffman's clients, confidential information, and customer goodwill.

21.     As part of the Hoffman acquisition, Oswald hired Defendant Neate as a Sales Executive and thereafter promoted him into an executive role as Vice President, Medina (Ohio) Market Leader in Oswald's service areas of property & casualty insurance, employee benefits, personal client management, retirement plan services, and life insurance.

22.     As an executive with Oswald, Neate was primarily responsible for the growth and profitability of Oswald's risk and insurance services throughout Medina County, Ohio, as well as direct team management and operations for the firm's Medina, Ohio office located at 5000 Foote Road, Medina, Ohio, 44256.  In addition, Neate was responsible for cultivating and maintaining client relationships throughout Medina County and Northeast Ohio as it pertained to these same products and services.   During that time, he reported to Oswald's Cleveland office.

23.     As a condition of his employment, on or after June 28, 2016, Neate executed a Non-Disclosure and Non-Solicitation Agreement ("Neate NDNS Agreement") in which Neate agreed to specific restrictive covenants governing his employment and post-employment obligations to

Oswald including, but not limited to, non-solicitation, non-disclosure, non-servicing and confidentiality. A true and accurate copy of the Neate NDNS Agreement is attached as **Exhibit 4**.

24. During his employment, Neate had extensive access to highly valuable, confidential and proprietary information. This information included but was not limited to various client contact information, customer relationship management (CRM) data, client employee census data, insurance and benefit plan design data and pricing models, retirement plan designs and pricing models, various carrier partnership and underwriting agreements, provider and supplier contact information, strategic planning plans and data, market performance, evaluation, and a variety of strategic targeted marketing materials. All of this information is confidential and proprietary, is not publicly known, has been generated and cultivated over many years, and gives Oswald a substantial competitive advantage over its competitors.

25. Oswald has engaged in reasonable efforts to preserve the secrecy of its confidential and proprietary information, including, among other actions, requiring passwords to access computer systems and databases, restricting access to secured shared files, having sales and other personnel enter into confidentiality, non-disclosure, non-solicitation and non-servicing agreements, preventing public access to non-public areas of Oswald's offices, and monitoring employee telephone and computer usage.

26. These efforts also included, among other things, requiring employees, such as Neate, who were provided access to Oswald's confidential and proprietary information and trade secrets, to sign written agreements that restrict their ability to use or disclose that information and that restricts them from entering into particular types of business or employment relationships for a period of two years after their employment ends.

### Defendant Michael Maitland

27. Prior to his employment at Oswald, Maitland also worked for Hoffman.

28.     On June 1, 2016 also as part of the Hoffman acquisition, Oswald hired Defendant Maitland as a Client Executive in Oswald's property and casualty business unit. Maitland was promoted by Oswald to Senior Client Executive on January 1, 2019. As a Senior Client Executive with Oswald, Maitland was primarily responsible for retaining and growing a book of business, serving as key relationship contact for all accounts and leading a client service team to serve the client's needs, including complex, multi-national accounts with multiple coverage lines and various funding mechanisms in a comprehensive insurance services program. Maitland also provided supervision of assigned account executives, including development, leading and execution of client account strategies and development of the client's annual service plan and goals, including stewardship, pre-renewal, policy delivery and open item components.

29.     Maitland worked for Oswald's Medina, Ohio office located at 5000 Foote Road, Medina, Ohio, 44256. Maitland was responsible for maintaining client service relationships throughout Medina County and Northeast Ohio and throughout the country. Maitland also reported to Oswald's Cleveland office.

30.     As a condition of his employment, on or after June 23, 2016, Maitland executed a Non-Disclosure and Non-Solicitation Agreement ("Maitland NDNS Agreement") in which Maitland agreed to specific restrictive covenants governing his employment and post-employment obligations to Oswald including, but not limited to, non-solicitation, non-disclosure, non-servicing and confidentiality. A true and accurate copy of the Maitland's NDNS Agreement is attached as **Exhibit 5**.

31.     During his employment, Maitland had extensive access to highly valuable, confidential and proprietary information. This information included but was not limited to various client contact information, customer relationship management (CRM) data, client employee census data, insurance and benefit plan design data and pricing models, retirement plan designs

and pricing models, various carrier partnership and underwriting agreements, provider and supplier contact information, strategic planning plans and data, market performance, evaluation, and a variety of strategic targeted marketing materials. All of this information is confidential and proprietary, is not publicly known, has been generated and cultivated over many years, and gives Oswald a substantial competitive advantage over its competitors.

32.     Oswald has engaged in reasonable efforts to preserve the secrecy of its confidential and proprietary information, including, among other actions, requiring passwords to access computer systems and databases, restricting access to secured shared files, having sales and other personnel enter into confidentiality, non-disclosure, non-solicitation and non-servicing agreements, preventing public access to non-public areas of Oswald's offices, and monitoring employee telephone and computer usage.

33.     These efforts also included, among other things, requiring employees, such as Maitland, who were provided access to Oswald's confidential and proprietary information and trade secrets, to sign written agreements that restrict their ability to use or disclose that information and that restricts them from entering into particular types of business or employment relationships for a period of two years after their employment ends.

### Defendant Annette Blanc

34.     Blanc worked for Oswald's Cleveland, Ohio office located at 1100 Superior Avenue, Cleveland, Ohio 44114. Blanc was promoted to the position of Team Leader, Operations Administration within Oswald's Property and Casualty business unit in September 2018.

35.     As a condition of her employment, on or about June 22, 2015, Blanc executed a Non-Disclosure and Non-Solicitation Agreement ("Blanc NDNS Agreement") in which Blanc agreed to specific restrictive covenants governing her employment and post-employment obligations to Oswald including, but not limited to, non-solicitation, non-disclosure, non-servicing

and confidentiality. A true and accurate copy of the Blanc's NDNS Agreement is attached as **Exhibit 6**.

36.     During her employment, Blanc had extensive access to highly valuable, confidential and proprietary information. This information included but was not limited to various client contact information, customer relationship management (CRM) data, client employee census data, insurance and benefit plan design data and pricing models, retirement plan designs and pricing models, various carrier partnership and underwriting agreements, provider and supplier contact information, strategic planning plans and data, market performance, evaluation, and a variety of strategic targeted marketing materials. All of this information is confidential and proprietary, is not publicly known, has been generated and cultivated over many years, and gives Oswald a substantial competitive advantage over its competitors.

37.     Oswald has engaged in reasonable efforts to preserve the secrecy of its confidential and proprietary information, including, among other actions, requiring passwords to access computer systems and databases, restricting access to secured shared files, having sales and other personnel enter into confidentiality, non-disclosure, non-solicitation and non-servicing agreements, preventing public access to non-public areas of Oswald's offices, and monitoring employee telephone and computer usage.

38.     These efforts also included, among other things, requiring employees, such as Blanc, who were provided access to Oswald's confidential and proprietary information and trade secrets, to sign written agreements that restrict their ability to use or disclose that information and that restricts them from entering into particular types of business or employment relationships for a period of two years after their employment ends.

### Defendant Christine Podlogar Loiselle

39.     Loiselle worked for Oswald's Cleveland, Ohio office. Loiselle previously worked directly with Defendants Neate and Maitland at Hoffman's Medina office. Loiselle was promoted to the position of Practice Leader, Select Practice, within Oswald's Property and Casualty business unit in July 2020.

40.     As a condition of her employment, in June 2016, Loiselle (then using her maiden name Podlogar) executed a Non-Disclosure and Non-Solicitation Agreement ("Loiselle NDNS Agreement") in which Loiselle agreed to specific restrictive covenants governing her employment and post-employment obligations to Oswald including, but not limited to, non-solicitation, non-disclosure, non-servicing and confidentiality. A true and accurate copy of the Loiselle's NDNS Agreement is attached as **Exhibit 7**.

41.     During her employment, Loiselle had extensive access to highly valuable, confidential and proprietary information. This information included but was not limited to various client contact information, customer relationship management (CRM) data, client employee census data, insurance and benefit plan design data and pricing models, retirement plan designs and pricing models, various carrier partnership and underwriting agreements, provider and supplier contact information, strategic planning plans and data, market performance, evaluation, and a variety of strategic targeted marketing materials. All of this information is confidential and proprietary, is not publicly known, has been generated and cultivated over many years, and gives Oswald a substantial competitive advantage over its competitors.

42.     Oswald has engaged in reasonable efforts to preserve the secrecy of its confidential and proprietary information, including, among other actions, requiring passwords to access computer systems and databases, restricting access to secured shared files, having sales and other personnel enter into confidentiality, non-disclosure, non-solicitation and non-servicing

agreements, preventing public access to non-public areas of Oswald's offices, and monitoring employee telephone and computer usage.

43.    These efforts also included, among other things, requiring employees, such as Loiselle, who were provided access to Oswald's confidential and proprietary information and trade secrets, to sign written agreements that restrict their ability to use or disclose that information and that restricts them from entering into particular types of business or employment relationships for a period of two years after their employment ends.

### Oswald's Non-Disclosure and Non-Solicitation Agreements with Defendants Neate, Maitland, Blanc and Loiselle

44.    The Neate, Maitland, Blanc and Loiselle NDNS Agreements each contain the following provision:

> Confidential Information. Employee acknowledges that he has had and will continue to have access to Confidential Information. Employee acknowledges that the Confidential Information has been maintained as confidential by Company and its Affiliates and is highly valuable and proprietary to Company and its Affiliates, and that disclosure of it to third parties or unauthorized use of it by Employee would cause Company and its Affiliates significant harm. Employee shall not at any time (whether during or after the period of his employment with Company) disclose to any third party any Confidential Information, and he shall confine use of Confidential Information exclusively to carrying out his responsibilities for Company. Employee shall, immediately upon termination or other cessation of his employment with Company, return to Company (or at Company's request, destroy) all Confidential Information, as well as any copies of that information and any other material, including without limitation handwritten notes and any electronic data or records or other manifestation, embodying, made or derived from that information, that is in Employee's possession or control.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 5.

45.    The Neate, Maitland, Blanc and Loiselle NDNS Agreements each define the following terms:

> "Confidential Information" means Products or Services Information, Account Information, Sales Personnel Information and all other trade secrets and proprietary information belonging to Company or any Affiliate, or information provided to Company or any Affiliate by third parties under any agreement or understanding

that Company or the Affiliate will maintain the information in confidence, but does not include any information generally available in Company's or any Affiliate's industry that became so available other than by virtue of any breach by Employee of any of his obligations hereunder.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 1(e).

"Account Information" means names, addresses, contact persons, purchasing histories and preferences, premiums, credit standing and any other information relating to Company's or any Affiliate's clients or prospective clients or their personnel.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 1(a).

"Products or Services Information" means any information related to the sale or marketing of current products, new products and service plans and other information relating to Products and Services.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 1(g).

"Sales Personnel Information" means the names and addresses of, amounts of commissions and other compensation paid to, and sales performance information and Account Information relating to, any Company or Affiliate employee or independent sales representative.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 1(h)

46.     In addition, the Neate, Maitland, Blanc and Loiselle NDNS Agreements provide

the following restrictions on non-solicitation and non-servicing:

Non-solicitation and Non-competition. Employee shall not, at any time between the date hereof and the second anniversary of the termination or other cessation of his employment with Company, directly or indirectly solicit or accept business on his own behalf or on behalf of any other person or entity, or assist any other person or entity in soliciting or accepting business, from any Company Account or Company Prospect, or directly or indirectly provide service on his own behalf or on behalf of any other person or entity, or assist any other person or entity in providing service, to any Company Account or Company Prospect.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 8.

47.     For purposes of this provision, the Neate, Maitland, Blanc and Loiselle NDNS

Agreements provide the following definitions:

"Company Account" means any person or entity that purchased any Product or Service from Company or any Affiliate at any time during the period of 365 consecutive days that ends on the day on which Employee's employment with Company ceases.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 1(c).

"Company Prospect" means any person or entity with whom Company or any Affiliate has had contact, in Employee's product or service discipline with Company or any Affiliate ( e.g., property and casualty, life insurance, or benefits), at any time during the period of 365 consecutive days that ends on the day on which Employee's employment with Company ceases (as used in this definition, "contact" means any form of communication, direct or indirect, including without limitation by telephone, voicemail, e-mail or a meeting, for the purpose of establishing or maintaining a business relationship).

*See* Exhibits 4, 5, 6 and 7 at Paragraph 1(d).

48.    The Neate, Maitland, Blanc and Loiselle NDNS Agreements also contain a Duty of

Loyalty provision imposing the following obligations upon Neate, Maitland, Blanc and Loiselle

while performing services for Oswald:

Best Efforts: Duty of Loyalty.

(a) Employee shall use his best efforts to carry out his responsibilities on behalf of Company and shall devote his entire working time to the performance of those responsibilities.
(b) Employee shall not at any time during his employment with Company engage, either directly or indirectly, as an employee, consultant, officer, director, shareholder, or partner, or in any other capacity, in any business or activity which is competitive with Company's or any Affiliate's business, or render any form of financial or other assistance to any such business.
(c) Employee shall not at any time during his employment with Company refer a client or prospective client of Company or of any Affiliate or any other person or entity to any person, firm, corporation or other business entity in exchange, directly or indirectly, for any form of compensation, without the prior written consent of Company.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 3.

49.    In their respective NDNS Agreements, Neate, Maitland, Blanc and Loiselle

expressly agreed and acknowledged the following:

> Employee acknowledges that (i) Sections 3, 5, 8 and 9 of this Agreement are reasonably necessary to protect Company's goodwill, trade secrets and other business interests and that they will cause Employee no undue hardship, (ii) those sections are applicable without regard to whether Employee originated the Company Account, Company Prospect or relationship giving rise to the Employee obligations set forth in those sections, (iii) any breach of any of those sections will cause Company immediate irreparable harm for which injunctive relief would be necessary, and (iv) those sections are of the essence of this Agreement. Those sections shall be construed as independent of any other provision in this Agreement, and the existence of any claim or cause of action in favor of Employee against Company or any Affiliate, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of any of those sections.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 10.

50.    Under the terms of their respective NDNS Agreements, Neate, Maitland, Blanc and Loiselle agreed to

> advise each person or firm with which he seeks employment, or any partnership or other business association, at any time before the second anniversary of termination or other cessation of his employment with Company, of the restrictions imposed on him by Sections 3, 5, 8, and 9 of this Agreement.

*See* Exhibits 4, 5, 6 and 7 at Paragraph 12.

### Defendants Neate's and Maitland's Employee Stock Ownership of Oswald

51.    Beginning in December 2016, Neate purchased shares of Oswald employee stock pursuant to Oswald's Subscription Agreement which via a Joinder Agreement bound him to the terms of the JBO Holding Company Third Amended and Restated Common Shares Buy Sell Agreement dated December 12, 2014 ("Oswald's Buy Sell Agreement") and subsequently the JBO Holding Company Bylaws ("Oswald's Bylaws"). Neate continued to purchase shares throughout his employment with Oswald.

52.    In December 2018, Oswald also granted and Neate purchased shares of restricted employee stock pursuant to Restricted Share Grant Agreements. The Restricted Share Grant Agreements required Neate's agreement to Oswald's Buy Sell Agreement and subsequently Oswald's Bylaws.

53.     Beginning in December 2017, Maitland purchased shares of Oswald employee stock pursuant to Oswald's Subscription Agreement ("Maitland Subscription Agreement") which via a Joinder Agreement bound him to the terms of Oswald's Buy Sell Agreement and subsequently Oswald Bylaws. Maitland continued to purchase shares throughout his employment with Oswald.

54.     At the time of their resignations, Neate and Maitland's employee stock was subject to the terms and conditions of the Second Amended and Restated Oswald Bylaws, which also expressly incorporate the terms of the Oswald Buy Sell Agreement.

55.     As shareholders of Oswald, Neate's and Maitland's Oswald's Buy Sell Agreement, Oswald's Bylaws, and Neate's Restricted Share Grant Agreements expressly required Neate and Maitland to abide by Oswald's non-competition, non-solicitation, non-servicing and non-disclosure obligations which continue to remain in effect without modification.

56.     The Oswald Buy Sell Agreement and Bylaws further define when and how much employee owners can receive for his or her employee stock. Specifically, Oswald Bylaws identify that a "termination with cause" exists when there are acts of disloyalty and unfaithfulness by a stockholder that materially adversely affects the business, or a Restrictive Covenant Breach by a stockholder.

57.     According to the Oswald Buy Sell Agreement and Oswald Bylaws, when an employee owner is terminated with cause, Oswald purchases the separating shareholder's shares at the purchase price which is equal to the lesser of fair market value amount and the original value of such shares of capital stock at the time of purchase.

58.     On May 16, 2022, Maitland requested that Oswald repurchase all of the Oswald shares held by him. Oswald repurchased Maitland's shares and transferred the repurchase funds to Maitland by wire transfer on May 27, 2022.

59.     On May 27, 2022, Neate requested that Oswald repurchase all of the Oswald shares held by him. Oswald repurchased Neate's shares and transferred the repurchase funds to Neate by wire transfer on June 10, 2022.

60.     Both Maitland and Neate received from Oswald the full fair market value of their repurchased Oswald shares.

61.     As discussed more fully below, both Maitland and Neate's actions manifesting their disloyalty and unfaithfulness as shareholders of Oswald and violations of the restrictive covenants in their respective NDNS Agreements became known to Oswald after it already paid full fair market value of the repurchased Oswald shares to each of them.

62.     Maitland and Neate's actions manifesting their disloyalty and unfaithfulness as shareholders of Oswald and violations of their respective NDNS Agreements constitutes contractual grounds for "termination with cause" under the Oswald Bylaws.

63.     Based on their disloyal and unfaithful actions and breaches of Oswald's restrictive covenants, Maitland and Neate were not entitled to receive fair market value for their respective shares of Oswald stock.

64.     Because Oswald paid fair market value, both Maitland and Neate received overpayment of their respective shares of Oswald stock upon repurchase in the amount of $126,261.75 for Maitland and $851,750.36 for Neate.

### Defendants Neate's and Maitland's Resignations and Activities With Hylant and Violations of their Oswald Agreements

65.     On May 2, 2022, Neate gave notice that he voluntarily resigned his employment with Oswald.  Neate's last day of employment with Oswald was May 16, 2022.

66.     Before Neate's last day of employment, Oswald conducted an exit interview with Neate, asked Neate to identify and return all Oswald property and information, and reminded him of his obligations under his NDNS Agreement.

67.     Upon information and belief, Neate has retained, used, copied, and disclosed Oswald's confidential and proprietary information without authorization or permission and in direct violation of the restrictive covenants in the Neate NDNS Agreement.

68.     After Neate's last day of his employment, Oswald learned that Neate was performing work not for the benefit of Oswald and instead was making plans to work for a competitor and take Oswald's Company Accounts and Company Prospects with him to the competitor. Specifically, Oswald has reason to believe that prior to resigning from Oswald, Neate engaged in conversations with a competitor and formulated a plan to solicit Oswald Company Accounts and Prospects and employees to the detriment of Oswald.

69.     On April 25, 2022, Maitland gave notice that he voluntarily resigned his employment with Oswald. Maitland's last day of employment with Oswald was May 6, 2022.

70.     Before Maitland's last day of employment, Oswald conducted an exit interview with Maitland, asked Maitland to identify and return all Oswald property and information, and reminded him of his obligations under his NDNS Agreement.

71.     Upon information and belief, Maitland has retained, used, copied, and disclosed Oswald's confidential and proprietary information without authorization or permission and in direct violation of the restrictive covenants in the Maitland NDNS Agreement.

72.     After Maitland's last day of his employment, Oswald learned that Maitland was performing work not for the benefit of Oswald and instead was formulating a plan with Neate to work for a competitor and take Oswald's Company Accounts and Company Prospects with him to the competitor. Specifically, Oswald has reason to believe that prior to resigning from Oswald,

Maitland engaged in conversations with a competitor and formulated a plan to solicit Oswald Company Accounts and Prospects and employees to the detriment of Oswald.

73. On or about April 28, 2022, before notifying Oswald of his resignation, Neate changed his LinkedIn account to add his personal email address. On or about May 6, 2022, Maitland changed his LinkedIn account to add his personal email address. Both Neate and Maitland also updated their LinkedIn accounts to provide their contact information for their new positions at Hylant, which immediately and automatically informed their entire networks of LinkedIn contacts (which included Oswald's key customer and prospect contacts and personnel) that they each left Oswald and now worked at Hylant.

74. On or about May 20, 2022, Defendant Maitland used his LinkedIn account to announce that "effective 5/31/22, [he] will be starting a new position as Client Service Executive at Hylant!" *See* **Exhibit 3,** Maitland's LinkedIn Profile Activity.

75. On or about May 27, 2022, Defendant Neate used his LinkedIn account to announce that he "started a new position as a Client Executive at Hylant." *See* **Exhibit 1,** Neate's LinkedIn Profile and Activity.

76. Each of Neate's and Maitland's LinkedIn contacts automatically received an "update" on their LinkedIn home page indicating that they each are now working at Hylant and suggesting that each LinkedIn contact "congratulate" them on their new positions. Approximately a dozen Oswald customers and prospective customers responded to Neate's and Maitland's LinkedIn messages from May 20 and 27.

77. Any time that Neate and Maitland post any messages on LinkedIn, including messages about Hylant, each of those messages is automatically delivered to each of their LinkedIn contacts on their LinkedIn home pages.

78.     Neate and Maitland, via LinkedIn, also automatically send emails to their LinkedIn contacts when they update their profiles with new job information.

79.     Through LinkedIn, Neate and Maitland can also send direct messages to individual contacts just like regular email. Neate's LinkedIn emails as of April 28, 2022 would be sent to his personal email address.

80.     Both Neate and Maitland have used LinkedIn to seek to "connect" to their former Oswald customers and prospects, which they can thereafter use to directly message those customers through LinkedIn.

81.     Both Neate and Maitland have LinkedIn contacts who work for their former Oswald customers and prospects – contacts that were developed or obtained while they worked for Oswald or as result of their employment at Oswald or Hoffman. Since leaving Oswald, both Neate and Maitland have interacted with their LinkedIn contacts who work for their former Oswald customers and prospects.

82.     On June 8, 2022, and approximately two weeks after Neate and Maitland contacted Oswald's customers and prospects via LinkedIn on May 20 and 27, 2022, Hylant issued a press release jointly advertising its hire of Michael Maitland as a client service executive and Dennis Neate as a client executive. *See* **Exhibit 2**, Hylant's 6/8/2022 Press Release.

83.     Defendant Hylant, like Oswald, is an insurance brokerage and risk management firm which sells property and casualty insurance, employee benefit plans, life insurance, retirement and financial services and a variety of other insurance and risk-related and financial wellness products and services.

84.     Pursuant to Paragraph 12 of their NDNS Agreements with Oswald, Defendants Neate and Maitland had an obligation to notify Hylant of their contractual restrictions with Oswald.

Upon information and belief, either Neate and Maitland failed to notify Hylant or all Defendants ignored the contractual restrictions in Neate and Maitland's NDNS Agreements with Oswald.

85. Upon information and belief, Neate and Maitland have taken, retained, used, copied, and disclosed Oswald's confidential and proprietary information without authorization or permission to unlawfully benefit themselves and their new employer, Hylant, in direct violation of Oswald's restrictive covenants. Specifically:

- Neate retained possession of Oswald's confidential property including an iPad issued by and belonging to Oswald that Neate has failed to return despite Oswald's request, in Paragraph 5 of the NDNS Agreement as well as his exit interview, that Neate return all Oswald property and confidential information in his possession.

- Neate and Maitland retained and used Oswald's key customer contact information from their cell phones, coupled with their knowledge of Oswald's historical customer data, that they have failed to return despite Oswald's request, in Paragraph 5 of the NDNS Agreement as well as their exit interviews, that Neate and Maitland return all Oswald property and confidential information in their possession.

- Neate and Maitland retained and used Oswald's key customer contact information from their LinkedIn accounts, coupled with their knowledge of Oswald's historical customer data, that they failed to return despite Oswald's request, in Paragraph 5 of the NDNS Agreement as well as their exit interview, that Neate and Maitland return all Oswald property and confidential information in their possession.

- In an effort to conceal his activities, Maitland attempted to delete the contents of his Oswald-issued email account.

86. Starting on or about June 10, 2022 and a mere two days after Hylant's press release and several weeks after Neate and Maitland directly contacted Oswald customers and prospects, Oswald received notifications of a Broker of Record ("BORs") change to Hylant for approximately twenty (20) Oswald Company Accounts which Defendants Neate and Maitland used to service while at Oswald.

87. On June 13, 2022, after Oswald received several notices of BOR changes to Hylant, Hylant purchased and published in Crain's Cleveland Business an advertisement of its hiring of Neate and Maitland.

88. Some of the customers who left to go to Hylant informed Oswald that they were going to work with Neate and/or Maitland.

89. On or about June 14, 2022, Oswald contacted Neate and thereafter spoke to Hylant's President to remind and inform them of Oswald's agreements and restrictive covenants with its employees. Despite that reminder, Defendants have solicited and attempted to hire several Oswald employees to come to work for Hylant and continue to solicit and service Oswald's clients and prospects, including but not limited to Hylant's use of former Oswald employees, including Neate, Maitland, Blanc and Loiselle, to solicit Oswald employees in contravention of their NDNS Agreements with Oswald.

90. Based on Oswald's conversation with Hylant's President, Hylant knows that Oswald's employees must sign NDNS Agreements similar to Neate's and Maitland's. Despite knowledge of Oswald's restrictive covenants, Hylant has offered bonuses and extra pay to Oswald's employees to incentivize improper retention, disclosure and use of Oswald's confidential, proprietary and trade secret information as well as improper solicitation and servicing of Oswald customers and prospects amongst other breaches of Oswald's NDNS Agreements.

91.     Despite Oswald's efforts to remind both Defendant Neate and Defendant Maitland of their contractual restrictions and the language in NDNS Agreements which requires Neate and Maitland to notify prospective and subsequent employers of their contractual restrictions, and Hylant's knowledge of Oswald's NDNS Agreements, Defendants continue to (1) violate both Neate and Maitland's contractual restrictions, (2) maintain, use, and disclose Oswald's confidential, proprietary and trade secret information to unlawfully compete with Oswald, (3) improperly solicit and service Oswald's customers and prospective customers, and (4) tortiously interfere with Oswald's existing customer, employee, and business relationships through use of Oswald's misappropriated information.

92.     Unless enjoined, Defendants will continue to misappropriate Oswald's trade secret information, breach Oswald's NDNS Agreements, act tortiously, and irreparably harm Oswald.

**Defendants Blanc's and Loiselle's Resignations and Activities With Hylant
and Violations of their Oswald Agreements**

93.     On June 21, 2021, Blanc gave notice that she voluntarily resigned her employment with Oswald.  Blanc's last day of employment with Oswald was July 2, 2021.

94.     Before Blanc's last day of employment, Oswald conducted an exit interview with Blanc, asked Blanc to identify and return all Oswald property and information, and reminded her of her obligations under her NDNS Agreement.

95.     Upon information and belief, Blanc is an employee of Hylant and on behalf of Hylant has contacted and met with and solicited current employees of Oswald to leave Oswald and become employed with Hylant.

96.     In October 2020, Loiselle gave notice that she voluntarily resigned her employment with Oswald. Loiselle's last day of employment with Oswald was October 20, 2020.

97. Before Loiselle's last day of employment, Oswald conducted an exit interview with Loiselle, asked Loiselle to identify and return all Oswald property and information, and reminded her of her obligations under her NDNS Agreement.

98. Upon information and belief, Loiselle is an employee of Hylant and on behalf of Hylant has contacted and met with and solicited current employees of Oswald to leave Oswald and become employed with Hylant.

99. Despite Oswald's efforts to remind both Defendant Blanc and Defendant Loiselle of their contractual restrictions and the language in NDNS Agreements which requires Blanc and Loiselle to notify prospective and subsequent employers of their contractual restrictions, and Hylant's knowledge of Oswald's NDNS Agreements, Defendants Blanc and Loiselle continue to (1) violate both Blanc and Loiselle's contractual restrictions, (2) improperly solicit Oswald's employees, and (3) tortiously interfere with Oswald's existing employee relationships.

100. Unless enjoined, Defendants Blanc and Loiselle will continue to breach Oswald's NDNS Agreements, act tortiously, and irreparably harm Oswald.

## COUNT ONE: REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

101. Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 100 as if fully rewritten herein.

102. Federal Civil Rule 65 allows this Honorable Court to issue temporary and preliminary injunctive relief under the circumstances verified in this Complaint.

103. In this case, Oswald submits the specific facts referenced in this Complaint that justify injunctive relief.

104. As detailed in this Verified Complaint, Defendants Neate, Maitland, Blanc and Loiselle each have committed multiple breaches of their NDNS Agreements with Oswald. Neate

and Maitland also have breached their fiduciary duties and contractual obligations under the Oswald Buy Sell Agreement and the Oswald Bylaws as Oswald shareholders and continue to possess, disclose, and use Oswald's confidential, proprietary and trade secret information.

105.    As detailed in this Verified Complaint, Defendant Hylant facilitated Neate and Maitland's breaches of their NDNS Agreements with Oswald, breach of their fiduciary duties to Oswald as employee owners, and their possession, disclosure and use of Oswald's confidential, proprietary and trade secret information. In addition, Defendants Blanc, Loiselle and Hylant continue to tortiously interfere with Oswald's relationships with its customers and employees as well as Oswald's NDNS Agreements with other Oswald employees.

106.    Neate and Maitlands' unlawful misappropriation, retention, and use of Oswald's confidential, proprietary, and trade secret information extends to Defendant Hylant, all of which now are direct competitors of Oswald.

107.    Defendants Neate and Maitland have already used Oswald's protected information in direct competition with Oswald. This has included using Oswald's confidential and proprietary information to compete unfairly and to contact and solicit Oswald's customers, prospects, and employees. Further use of Oswald's confidential, proprietary, and trade secret information will jeopardize Oswald's ability to fairly compete in the marketplace and give Defendants an unfair and unlawful advantage.

108.    As detailed in this Verified Complaint, Defendants have engaged in conduct for which Oswald has no adequate remedy at law and faces immediate and irreparable injury, loss, or damage, including but not limited to, Oswald's loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in

generating its confidential information. No amount of money could compensate Oswald for these losses.

109. For these reasons, Oswald is entitled to a temporary restraining order and preliminary injunctive relief, enjoining and restraining Defendants and any other person or entity acting in aid or concert, or in participation with them as follows: (a) prohibiting Neate, Maitland, Blanc and Loiselle from any further use of Oswald information and solicitation and servicing of Oswald's employees, customers, or prospects; (b) requiring Defendants and any other person or entity acting in aid or concert, or in participation with them, to sever the relationship with any customers who were contacted, solicited, serviced, and/or obtained as a result of the contractual violations of Neate or Maitland; (c) prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from soliciting, servicing, or encouraging any Company Account or Company Prospect as defined in the Neate, Maitland, Blanc and Loiselle NDNS Agreements; (d) prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from soliciting, servicing, or encouraging any employee, contractor, and/or vendor to terminate their relationship with Oswald; (e) prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from otherwise using or disclosing any of Oswald's trade secret or confidential information; (f) prohibiting Neate, Maitland, Blanc and Loiselle from engaging in any other conduct that would otherwise violate their respective NDNS Agreements; (g) prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from interfering with Oswald's business and/or employment relationships and/or contracts; (h) requiring all Defendants to immediately return all of Oswald's property and information; and (i) prohibiting Defendants Neate and Maitland from disbursing, distributing, spending, transferring or otherwise disposing of the stock

repurchase funds received by them from Plaintiff and for which they have been overpaid in the amounts of $126,261.75 for Maitland and $851,750.36 for Neate.

## COUNT TWO: MISAPPROPRIATION AND USE OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT
### (Against All Defendants)

110.    Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 109 as if fully rewritten herein.

111.    The confidential and proprietary information to which Neate and Maitland both were exposed and had access while employed at Oswald, as described in this Verified Complaint, was not publicly known, has been generated and cultivated by Oswald over many years, gives Oswald a substantial competitive advantage over its competitors and constitutes trade secrets within the meaning of 18 U.S.C. §1839(3).

112.    This confidential and proprietary information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by other persons.

113.    Oswald took reasonable steps to protect its confidential, proprietary and trade secret information, as described in this Verified Complaint.

114.    Upon information and belief, since having left Oswald and continuing to the present, Neate, Maitland, Blanc and Loiselle, each without justification or privilege to do so, has misappropriated Oswald's trade secrets such as key experienced and skilled workforce and personnel contact information, customer contact information, needs and preferences, and other customer-related information used in, or intended for use in, interstate or foreign commerce, by taking, retaining, disclosing, and using Oswald's confidential, proprietary, and trade secret information to further their individual business interests and the interests of Defendant Hylant to directly compete with Oswald.

115. Defendants have individually and collectively taken, retained, disclosed, and used Oswald's confidential, proprietary and trade secret information in their operations, pricing, solicitation of business, and solicitation of Oswald employees, customers and restricted prospective customers to unfairly compete with Oswald.

116. Defendants have failed to return Oswald's confidential, proprietary, and trade secret information in their possession.

117. Oswald has no adequate remedy at law to redress these misappropriations of its trade secrets and faces immediate and irreparable injury, loss, or damage as a result of the misappropriation of its confidential and proprietary trade secrets.

118. As a direct and proximate result of Defendants' actions, Oswald faces the immediate and irreparable loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its confidential information. Oswald has no adequate remedy at law for these losses and no amount of money could compensate Oswald for these losses.

119. Oswald is entitled to a temporary restraining order and preliminary and permanent injunctive relief, enjoining, and restraining Defendants and any other person or entity acting in aid or concert, or in participation with them as set forth above in Count One of the Verified Complaint.

120. As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount, including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including attorney fees and costs associated with this action.

### COUNT THREE: MISAPPROPRIATION AND USE OF TRADE SECRETS UNDER OHIO LAW
**(Against All Defendants)**

121.    Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 121 as if fully rewritten herein.

122.    The confidential and proprietary information to which Neate and Maitland both were exposed and had access while employed at Oswald, as described in this Verified Complaint, was not publicly known, has been generated and cultivated by Oswald over many years, gives Oswald a substantial competitive advantage over its competitors and constitutes trade secrets within the meaning of Section 1333.61(D) of the Ohio Revised Code.

123.    This confidential and proprietary information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by other persons.

124.    Oswald took reasonable steps to protect its confidential, proprietary and trade secret information, as described in this Verified Complaint.

125.    Upon information and belief, since having left Oswald and continuing to the present, Neate, Maitland, Blanc and Loiselle, each without justification or privilege to do so, has misappropriated Oswald's confidential, proprietary, and trade secret information, such as key experience and skilled workforce and personnel contact information, customer contact information, preferences and needs, and other customer-related information to further their business interests and the interests of Defendant Hylant to Oswald's detriment.

126.    Neate, Maitland, Blanc and Loiselle further misappropriated Oswald's trade secrets by, among other actions, surreptitiously and without justification or privilege to do so, taking, retaining, using, disclosing and copying Oswald's confidential, proprietary and trade secret information, such as key experienced and skilled workforce and personnel contact information,

customer contact information, needs, and other customer-related information to solicit Oswald's customers on behalf of Defendant Hylant and therefore unfairly compete with Oswald.

127.    Defendants Neate, Maitland, Blanc, and Loiselle have taken, retained, disclosed, and used Oswald's confidential, proprietary and trade secret information that it unlawfully obtained from Oswald, directly or indirectly, to contact and solicit Oswald employees, customers, and prospects, and to gain an unfair advantage against Oswald.

128.    Oswald has no adequate remedy at law to redress these misappropriations of its trade secrets and faces immediate and irreparable injury, loss, or damage as a result of the misappropriation of its confidential and proprietary trade secrets.

129.    As a direct and proximate result of Defendants' actions, Oswald faces the immediate and irreparable loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its confidential information.  Oswald has no adequate remedy at law for these losses and no amount of money could compensate Oswald for these losses.

130.    Oswald is entitled to a temporary restraining order and preliminary and permanent injunctive relief, enjoining and restraining Defendants and any other person or entity acting in aid or concert, or in participation with them as set forth above in Count One of this Verified Complaint.

131.    As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount to be proven at trial, including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including attorney fees and costs associated with this action.

## COUNT FOUR: BREACH OF CONTRACTS
### (Against Defendants Neate, Maitland, Blanc and Loiselle)

132.     Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 131 as if fully rewritten herein.

133.     After June 28, 2016, Neate entered into the Neate NDNS Agreement with Oswald. As consideration for the Neate NDNS Agreement, Oswald provided Neate continued employment and access to its highly confidential, proprietary and trade secret information.

134.     After June 23, 2016, Maitland entered into the Maitland NDNS Agreement with Oswald. As consideration for the Maitland NDNS Agreement, Oswald provided Maitland continued employment and access to its highly confidential, proprietary and trade secret information.

135.     On or about June 22, 2015, Blanc entered into the Blanc NDNS Agreement with Oswald. As consideration for the Blanc NDNS Agreement, Oswald provided Blanc continued employment and access to its highly confidential, proprietary and trade secret information.

136.     In June 2016, Loiselle entered into the Loiselle NDNS Agreement with Oswald. As consideration for the Loiselle NDNS Agreement, Oswald provided Loiselle continued employment and access to its highly confidential, proprietary and trade secret information.

137.     In their respective NDNS Agreements, Neate, Maitland, Blanc and Loiselle agreed not to solicit or service Oswald's customers and prospects for a period of two years after termination of employment, not to solicit Oswald's employees, and to keep Oswald's confidential, proprietary, and trade secret information secret.

138.     Similarly, as employee owners, Neate and Maitland agreed in Oswald's Buy Sell Agreement to abide by Oswald's restrictive covenants, including any non-competition, non-solicitation, non-servicing and non-disclosure agreements such as Oswald's NDNS Agreement.

139.     Neate has breached the Neate NDNS Agreement and the Oswald Buy Sell Agreement by, among other actions, engaging in solicitations of Oswald's clients and prospects within the restricted period of time set forth in the Neate NDNS Agreement, servicing Oswald clients and prospects within the restricted period of time set forth in the Neate NDNS Agreement, engaging in solicitations of Oswald employees within the restricted period of time set forth in the Neate NDNS Agreement, and by taking, retaining, using, and disclosing Oswald's confidential and proprietary information and trade secret information to aid Defendants to unfairly compete with Oswald in the marketplace.

140.     Maitland has breached the Maitland NDNS Agreement and the Oswald Buy Sell Agreement by, among other actions, engaging in solicitations of Oswald's clients and prospects within the restricted period of time set forth in the Maitland NDNS Agreement, servicing Oswald clients and prospects within the restricted period of time set forth in the Maitland NDNS Agreement, engaging in solicitations of Oswald employees within the restricted period of time set forth in the Maitland NDNS Agreement, and by taking, retaining, using, and disclosing Oswald's confidential and proprietary information and trade secret information to aid Defendants to unfairly compete with Oswald in the marketplace.

141.     Upon information and belief, Blanc has breached the Blanc NDNS Agreement by engaging in solicitations of Oswald employees within the restricted period of time set forth in the Blanc NDNS Agreement.

142.     Upon information and belief, Loiselle has breached the Loiselle NDNS Agreement by engaging in solicitation of Oswald employees within the restricted period of time set forth in the Loiselle NDNS Agreement.

143.     Oswald has performed all of its obligations under the Oswald Buy Sell Agreement and the Neate, Maitland, Blanc and Loiselle NDNS Agreements and all conditions precedent to

the enforcement of the Neate, Maitland, Blanc and Loiselle NDNS Agreements and Oswald Buy Sell Agreement have been satisfied, waived, or abandoned.

144. Oswald faces immediate and irreparable injury, loss, or damage as a result of the misappropriation of its confidential and proprietary trade secrets, and unlawful solicitation and servicing of Oswald clients and employees.

145. As a direct and proximate result of Neate's, Maitland's, Blanc's and Loiselle's multiple and ongoing breaches of their NDNS Agreements, Oswald faces the immediate and irreparable loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its confidential information. Oswald has no adequate remedy at law for these losses and no amount of money could compensate Oswald for these losses.

146. Oswald is entitled to a temporary restraining order and preliminary and permanent injunctive relief, enjoining and restraining Defendants and any other person or entity acting in aid or concert, or in participation with them as set forth above in Count One of this Verified Complaint.

147. As a further direct and proximate result of Defendant Neate's and Maitland's breaches, Oswald has been monetarily damaged by paying Neate and Maitland fair market value when their conduct qualified as a termination with cause resulting in an overpayment in the amount of $126,261.75 for Maitland and $851,750.36 for Neate.

148. As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount to be proven at trial including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including attorney fees and costs associated with this action.

## COUNT FIVE: TORTIOUS INTERFERENCE
## WITH CONTRACT, EMPLOYEE, AND BUSINESS RELATIONSHIPS
### (Against All Defendants)

149.     Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 148 as if fully rewritten herein.

150.     Defendants Neate and Maitland were aware of Oswald's business relationship with clients and prospective clients, and without authorization to do so, Neate and Maitland, in concert with Hylant, contacted Oswald clients for the purpose of interfering with Oswald's business relationship with these clients.

151.     Defendants Blanc and Loiselle were aware of Oswald's business relationships with its current employees, and without authorization to do so, Blanc and Loiselle, in concert with Hylant, contacted Oswald's current employees for purposes of soliciting them and interfering with Oswald's business relationships with these employees.

152.     Hylant was aware of Oswald's relationship with Neate, Maitland, Blanc and Loiselle and their respective NDNS Agreements with Oswald, and without justification or privilege, wrongfully interfered with those contractual and business relationships by soliciting and then employing Neate and Maitland in a competitive business for the purpose of using Oswald's confidential, proprietary, and trade secret information and soliciting and servicing Oswald clients and prospects and employees, and thus unfairly and unlawfully competing against Oswald.

153.     Defendants were aware of Oswald's key employee relationships and Oswald's NDNS Agreements, and without justification, privilege, or authorization to do so, Defendants wrongfully interfered with Oswald's relationships with its employees and Oswald's restrictive covenants of others.

154. Through their actions, Neate, Maitland, Blanc and Loiselle and Hylant have worked in concert with potentially others to maliciously, willfully and intentionally interfered with Oswald's business, customer, employee, business and contractual relationships.

155. As a direct and proximate result of the Defendants' actions, Oswald faces the immediate and irreparable loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its confidential information. Oswald has no adequate remedy at law for these losses and no amount of money could compensate Oswald for these losses.

156. Oswald is entitled to a temporary restraining order and preliminary injunctive relief, enjoining and restraining Defendants, and any other person or entity acting in aid or concert, or in participation with them as set forth above in Count One of this Verified Complaint.

157. As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount, including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including any attorney fees and costs associated with this action.

## COUNT SIX: BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY
### (Against Defendants Neate and Maitland)

158. Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 157 as if fully rewritten herein.

159. In December 2016, Neate made his initial purchase of Oswald employee stock and became an employee owner of Oswald. He remained an Oswald stockholder until June 10, 2022 when Oswald repurchased his stock.

160. In December 2018, Maitland made his initial purchase of Oswald employee stock and became an employee owner of Oswald. He remained an Oswald stockholder until May 27, 2022 when Oswald repurchased his stock.

161. As employee owners of Oswald, Neate and Maitland purchased shares and were entitled to buy back of their shares under the terms and conditions of Oswald's Buy Sell Agreement and Bylaws if they continued to perform services for the benefit of Oswald.

162. As employee owners of Oswald, Neate and Maitland were in fiduciary relationships in which Oswald placed special confidence and trust. As a result of this special trust, Oswald permitted Neate and Maitland to attend shareholder meetings and provided Neate and Maitland access to Oswald's highly sensitive valuable, confidential, proprietary, and trade secret information, company-wide customer information, its revenue, finances, earnings and expense records, financial forecasts, future strategic plans and other financial and accounting information.

163. By reason of this relationship, Neate and Maitland had a duty to exercise the highest degree of skill, care, good faith and loyalty in protecting the interests of Oswald, including, but not limited to Oswald's interests in maintaining employment relationships, maintaining confidentiality over Oswald's highly sensitive valuable, confidential, proprietary and trade secret information.

164. Neate and Maitland willfully, maliciously and consciously disregarded Oswald's rights, breached its fiduciary duties to Oswald, including the duties of loyalty and good faith by, among other things, working against Oswald's interests, soliciting Oswald's clients to reduce their business with Oswald and work with a competitor, soliciting Oswald employees to terminate their relationships with Oswald, improperly using Oswald information to gain a competitive advantage, providing a competitor with unauthorized access to Oswald's confidential, proprietary and trade secret information, and engaging in self-dealing.

165.     As a direct and proximate result of Neate's and Maitland's actions, Oswald faces the immediate and irreparable loss of its trade secrets and other proprietary information, the loss of its competitive position, the loss of business goodwill, the loss of experienced workforce, loss of sales, and the loss of investment in time and energy in generating its confidential and proprietary information. Oswald has no adequate remedy at law for these losses and no amount of money can compensate Oswald for these losses.

166.     Oswald is entitled to a temporary restraining order and preliminary injunctive relief, enjoining and restraining Defendants, and any other person or entity acting in aid or concert or in participation with them as set forth above in Count One of this Verified Complaint.

167.     As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount, including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including any attorney fees and costs associated with this action.

## COUNT SEVEN: CONVERSION
### (Defendants Neate, Maitland and Hylant)

168.     Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 167 as if fully rewritten herein.

169.     Oswald has, at all relevant times, been the owner of its confidential, proprietary and trade secret information and company-issued property and accounts.

170.     After the termination of their employment with Oswald, Neate and Maitland did not immediately return all of Oswald's confidential information and property. Instead, Maitland deleted contents from his Oswald-issued email account and Neate failed to return the Oswald-issued iPad in his possession despite Oswald's request that he return all Oswald property.

171.     As described above and without knowledge or authorization of Oswald, Defendants Neate and Maitland have unlawfully taken and converted Oswald's confidential or proprietary information and property that they knew belong to Oswald, to further their own and Hylant's interests and business opportunities to the detriment of Oswald.

172.     To date, none of the Defendants have returned Oswald's confidential, proprietary information and property that continues to remain in their possession.

173.     To date, Defendants have not returned or paid for Oswald's overpayment of shares or resources that continue to remain in their possession.

174.     As a direct and proximate result of Defendants' actions, Oswald faces the immediate and irreparable loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its confidential information.  Oswald has no adequate remedy at law for these losses and no amount of money could compensate Oswald for these losses.

175.     Oswald is entitled to a temporary restraining order and preliminary injunctive relief, enjoining and restraining Defendants and any other person or entity acting in aid or concert or in participation with them as set forth above in Count One of this Verified Complaint.

176.     As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount, including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including any attorney fees and costs associated with this action.

### COUNT EIGHT:  UNJUST ENRICHMENT
**(Defendants Neate, Maitland and Hylant)**

177.    Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 176 as if fully rewritten herein.

178.    After the termination of their employment with Oswald, Neate and Maitland did not immediately return all of Oswald's confidential information and property. Instead, Maitland deleted contents from his Oswald-issued email account and Neate failed to return the Oswald-issued iPad in his possession despite Oswald's request that he return all Oswald property.

179.    As described above and without knowledge or authorization of Oswald, Defendants Neate and Maitland have unlawfully taken and used Oswald's confidential or proprietary information and property that they knew belong to Oswald, to further their own and Hylant's interests and business opportunities to the detriment of Oswald.

180.    After the termination of their employment with Oswald, Defendants Neate and Maitland did not immediately return all of Oswald's confidential or proprietary information and property. Instead, both Neate and Maitland continued to access Oswald's confidential information and property through at least use of their LinkedIn accounts and cell phones.

181.    To date, none of the Defendants have returned Oswald's confidential, proprietary information and property that continues to remain in their possession.

182.    To date, Defendants Neate and Maitland have not returned or paid for Oswald's overpayment of shares or resources that continue to remain in their possession.

183.    Defendants Neate, Maitland and Hylant have taken, used and disclosed Oswald's confidential or proprietary information and property that they knew belong to Oswald, and unlawfully benefitted from using Oswald's confidential, proprietary information and property to replicate Oswald's business model, develop and increase the business opportunities of Hylant and themselves in unfair competition with Oswald.

184.     Neate and Maitland have also unjustly received fair market value for their Oswald employee stock when they engaged in disloyal and unfaithful conduct and breached Oswald's restrictive covenants.

185.     As a direct and proximate result of Defendants Neate's, Maitland's and Hylant's actions, Oswald faces the immediate and irreparable loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its confidential information.  Oswald has no adequate remedy at law for these losses and no amount of money could compensate Oswald for these losses.

186.     Oswald is entitled to a temporary restraining order and preliminary injunctive relief, enjoining and restraining Defendants Neate, Maitland and Hylant and any other person or entity acting in aid or concert or in participation with them as set forth above in Count One of this Verified Complaint.

187.     As a further direct and proximate result of Defendants' actions, Neate and Maitland have also been unjustly enriched in the amount of $126,261.75 for Maitland and $851,750.36 for Neate based on the overpayment of the employee stock at fair market value.

188.     As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount, including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including any attorney fees and costs associated with this action.

### COUNT EIGHT:  CIVIL CONSPIRACY
**(All Defendants)**

189.     Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 188 as if fully rewritten herein

190. Without justification or privilege, Defendants Neate, Maitland and Hylant maliciously conspired and worked in concert with one another to cause damage to Oswald by taking, accessing, retaining and using Oswald's confidential, proprietary or trade secret information for the benefit of themselves in violation of Ohio and Federal law, in violation the Neate and Maitland NDNS Agreements, in violation of Oswald's Buy Sell Agreement and Oswald ByLaws, and in violation of Defendants' fiduciary and loyalty duties to Oswald.

191. Without justification or privilege, Defendants Neate, Maitland, Blanc, Loiselle and Hylant maliciously conspired and worked in concert with one another to cause damage to Oswald by developing a scheme that involved encouraging Neate, Maitland, Blanc and Loiselle and other employees to solicit Oswald employees and persuade them to terminate their employment and work for Hylant in violation of their Agreements, in violation of Defendants Neate's and Maitland's fiduciary and loyalty duties to Oswald, and by misappropriating Oswald's confidential, proprietary or trade secret information to do so.

192. Without justification or privilege, Defendants maliciously conspired and worked in concert with one another to cause financial damage and competitive harm to Oswald by developing a scheme under which Hylant would provide a compensation bonus to any former Oswald employee who was able to solicit and secure business from Oswald's customers, thereby incentivizing Oswald employees to misappropriate Oswald's confidential, proprietary trade secret information for unauthorized use to further their own and Hylant's business opportunities.

193. As a direct and proximate result of the Defendants' actions, Oswald faces the immediate and irreparable loss of its confidential, proprietary or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its

confidential information. Oswald has no adequate remedy at law for these losses and no amount of money could compensate Oswald for these losses.

194.     Oswald is entitled to a temporary restraining order and preliminary injunctive relief, enjoining and restraining Defendants and any other person or entity acting in aid or concert with or in participation with them as set forth above in Count One of this Verified Complaint.

195.     As a direct and proximate result of Defendants' actions, Oswald has also been damaged in a monetary amount, including punitive damages, to be proven at trial, but which in no event is less than seventy-five thousand dollars ($75,000) including any attorney fees and costs associated with this action.

## COUNT NINE: CONSTRUCTIVE TRUST
### (Against Defendants Neate and Maitland)

196.     Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 195 as if fully rewritten herein.

197.     By virtue of the employee owner relationship that existed between Neate, Maitland and Oswald, upon their request after their resignation, Oswald repurchased Neate and Maitland's shares of Oswald stock in May and June, 2022.

198.     At the time of the stock repurchases, Oswald had no knowledge of Neate and Maitland's actions in breach of their fiduciary and loyalty duties to Oswald.

199.     At the time of the stock repurchases, Oswald had no knowledge of Neate and Maitland's actions in breach of their respective NDNS Agreements.

200.     At the time of the stock repurchases, Oswald had contractual grounds to terminate both Neate and Maitland for cause under the Oswald Bylaws.

201.    Because Neate and Maitland surreptitiously engaged in actions to conspire with Hylant prior to their departure from Oswald, Oswald unknowingly overpaid Neate and Maitland by purchasing their Oswald shares at fair market value.

202.    Neate and Maitland's surreptitious actions resulted in them wrongly taking the full stock repurchase funds from Oswald to which they are not entitled.

203.    Neate and Maitland have been unjustly enriched by their surreptitious actions.

204.    Neate and Maitland's actions have resulted in damages to Oswald which are irreparable in nature because the stock repurchase funds have been provided to Neate and Maitland and can be forever dissipated and unrecoverable.

205.    Oswald seeks the imposition of a constructive trust on all proceeds from the stock repurchases received by Maitland and Neate in excess of the original value of their respective shares of Oswald stock.

## COUNT TEN:  PUNITIVE DAMAGES
### (Against All Defendants)

206.    Oswald incorporates herein by reference all allegations set forth in Paragraphs 1 through 205 as if fully rewritten herein.

207.    Defendants have acted with actual malice and committed intentional, reckless, wanton, willful, and/or gross acts that have and continue to cause injury to Oswald and its property.

208.    Neate, Maitland, Blanc and Loiselle each signed a binding NDNS Agreement with Oswald.

209.    Notwithstanding the NDNS Agreements and warnings about their obligations, Neate, Maitland, Blanc and Loiselle each have and continue to willfully violate the agreements with the aid and knowledge of Defendant Hylant.

210. All Defendants have knowingly and willfully engaged in unlawful business practices and have interfered with Oswald's customer, employee, contractual and business relationships.

211. Defendants continue to knowingly, unlawfully and/or tortiously harm Oswald through material and intentional misrepresentations to customers and others.

212. Defendants, jointly and severally, acted and otherwise conducted themselves as alleged herein maliciously, fraudulently, oppressively, with malice, and/or with a conscious disregard for the rights of Oswald.

213. Oswald is entitled to the maximum award of punitive damages permitted by law.

### DAMAGES

WHEREFORE, Plaintiff Oswald respectfully requests that this Court enter judgment in its favor and against Defendants on the Complaint as follows:

1. That this Court temporarily, preliminarily and permanently enjoin and restrain Defendants and any other person or entity acting in aid or concert, or in participation with them as follows:

    (a). Prohibiting Defendants Neate, Maitland, Blanc and Loiselle from any further use of Oswald information and from any solicitation or servicing of Oswald's employees, customers, or prospects;

    (b). Requiring Defendants and any other person or entity acting in aid or concert, or in participation with them, to sever the relationship with any customers who were contacted, solicited, serviced and/or obtained as a result of the contractual violations of Neate and Maitland;

    (c). Prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from soliciting, servicing or

encouraging any Company Account or Company Prospect as defined in the Neate, Maitland, Blanc and Loiselle NDNS Agreements;

(d). Prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from soliciting, servicing, or encouraging any employee, contractor, and/or vendor to terminate their relationship with Oswald;

(e). Prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from otherwise using or disclosing any of Oswald's trade secret or confidential information;

(f). Prohibiting Defendants Neate, Maitland, Blanc and Loiselle from engaging in any other conduct that would otherwise violate the NDNS Agreements; and

(g). Prohibiting Defendants and any other person or entity acting in aid or concert, or in participation with them from interfering with Oswald's business and/or employment relationships and/or contracts;

(h). Requiring all Defendants to immediately return all of Oswald's property and information; and

(i). Prohibiting Defendants Neate and Maitland from disbursing, distributing, spending, transferring or otherwise disposing of the stock repurchase funds received by them from Plaintiff and for which they have been overpaid in the amounts of $126,261.75 for Maitland and $851,750.36 for Neate.

2. That this Court require Defendants and any other person or entity acting in aid or concert, or in participation with them, to immediately return all of Oswald's property, keeping no copy;

3. That this Court require Defendants to provide an accounting of all profits, compensation, commission, remuneration, and other benefits said Defendants have obtained through the activities described herein;

4. That Oswald be awarded compensatory and punitive damages in an amount to be proven at trial, including but not limited to, the amount of stock overpayment of $126,261.75 for Maitland and $851,750.36 for Neate, including any pre- and post-judgment interest;

5. That Oswald be awarded its reasonable attorneys' fees and costs;

6. Such other relief in Oswald's favor that the Court deems just and required under the circumstances of this case.

<div style="margin-left: 40%;">

Respectfully submitted,

ZASHIN & RICH CO., L.P.A.

*s/ Ami J. Patel*
Stephen S. Zashin (0064557) ssz@zrlaw.com
Lisa A. Kainec (0061551) lak@zrlaw.com
Ami J. Patel (0078201) ajp@zrlaw.com
Zashin & Rich Co. LPA
950 Main Avenue, 4th Floor
Cleveland, OH 44113
T: (216) 696-4441
F: (216) 696-1618

*Attorneys for Plaintiffs The James B. Oswald Company, d/b/a Oswald Companies and JBO Holding Company*

</div>

# <u>VERIFICATION</u>

STATE OF OHIO            )
                                  )    SS:

COUNTY OF CUYAHOGA      )

I swear that the facts recited in the foregoing Verified Complaint for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction, and Other Relief are true to the best of my knowledge.

Joseph G. DuBois
Chief Financial Officer, JBO Holding Company and The James B. Oswald Company, d/b/a Oswald Companies

SWORN TO BEFORE ME and subscribed in my presence this 21st day of June, 2022.

Notary Public
My commission expires on: 3-4-2024

CAROL ANN BURLAK
Notary Public, State of Ohio
My Commission Expires
March 4, 2024